```
 1              UNITED STATES DISTRICT COURT
 2               DISTRICT OF MASSACHUSETTS
 3  ************************
 4  KEVIN CLAPP,
 5          Plaintiff,
 6          vs.                C.A. No. 18-10426-ADB
 7  CHARLES BAKER, et al.,
 8          Defendants.
 9  ************************
10
11
12              DEPOSITION OF KEVIN CLAPP
13                Conducted Remotely
14                68 Commercial Wharf
15               Boston, Massachusetts
16              Tuesday, October 6, 2020
17                  11:48 a.m. EDT
18
19
20
21
22
23
24
```

Kevin Clapp vs
Charles Baker, et al.

Kevin Clapp
October 06, 2020

4

```
 1            I N D E X
 2                                        Page
 3 Examination by Mr. Rogal                 7
 4
 5
 6
 7            E X H I B I T S
 8 Number                                  Page
 9 Exhibit 1    Letter, 9/24/20             6
10 Exhibit 2    Amended Complaint           6
11 Exhibit 3    E-mail, 3/7/16              6
12 Exhibit 4    Letter, 3/9/16              6
13 Exhibit 5    Letter, 3/10/16             6
14 Exhibit 6    Arrest Report               6
15 Exhibit 7    Letter, 3/9/16              6
16 Exhibit 8    Initial Disclosure          6
17 Exhibit 9    Letter, 7/31/20             6
18 Exhibit 10   Letter, 5/14/20             6
19 Exhibit 11   Answers to Interrogatories  6
20 Exhibit 12   Answers to Interrogatories  6
21 Exhibit 13   First Set of Interrogaties  6
22 Exhibit 14   First Request for Production 6
23              of Documents
24 Exhibit 15   Answers to Interrogatories  6
```

Kevin Clapp vs
Charles Baker, et al.

Kevin Clapp
October 06, 2020

83

1  saying "Get out of the car."  My first response,
2  my first thought was it's a carjacking.  They've
3  had them.  I mean, it happens anywhere.  There was
4  no identity, no flashlight, there was no nothing.
5  So I tried to put the key back in the ignition
6  because I was going to drive away.  I was just
7  going to drive back up and screw, take off.  I'm
8  not going to be killed.  And my first response is
9  it's got to be some type of a carjacking.
10      Q.   So where was this person when he spoke
11 to you?
12      A.   By the door, but I don't remember.
13 Front windshield, inside the door by my foot, I'm
14 not that detailed on it.
15      Q.   I take it you did not know at the time
16 who that person was; is that correct?
17      A.   No, I did not.
18      Q.   Do you now know who this person was who
19 spoke to you first?
20      A.   I still don't.
21      Q.   After the person said "Get out of the
22 car," did you say anything?
23      A.   I think -- well, first I tried to put
24 the key in the ignition and he tried to grab the

Kevin Clapp vs
Charles Baker, et al.

Kevin Clapp
October 06, 2020

84

1 key.  I'm trying to -- I'm trying to start the car

2 because I'm trying to get away.

3    Q.   Did he say anything to you, "Don't start

4 the car," did you say anything to him?

5    A.   He said, "Don't start" -- he might have

6 said, "Don't start the car," or "Give me the

7 keys."  I said, "I'm not giving you the keys."

8 Then I went to put my hand in the bag and to get

9 the phone because I was going to call 9-1-1 and he

10 said, "Take your hand out of the bag."  So I

11 complied on that because I figured he might have

12 had a gun or something.  I don't know.

13    Q.   Did you ever see a gun?

14    A.   No.

15    Q.   Did he ever say "I'm a police officer.

16 I'm a trooper"?

17    A.   Absolutely not, no.

18    Q.   Did he ever say "You're under arrest"?

19    A.   No.

20    Q.   Did you try and close the door?

21    A.   I can't remember that.

22    Q.   Did anything prevent from you closing

23 the door?

24    A.   Yeah, I think they all came ambushing

Kevin Clapp vs
Charles Baker, et al.

Kevin Clapp
October 06, 2020

85

1  over at that time.

2      Q.    Well --

3      A.    The other three.  Well, they came over

4  like wild boars, they looked like they were

5  frothing at the mouth.  They came like -- I

6  referred to them as "wild boars."

7      Q.    Were all four troopers frothing at the

8  mouth, just three of them or what?

9      A.    I don't know.  I'm not a doctor.

10     Q.    I'm asking for your observations.

11     A.    Well, you know, I don't know because,

12  you know, it's like a woman being raped and you're

13  trying to ask her questions.  It's very traumatic

14  what I went through.  I'm in counseling.  I'm not

15  being sarcastic.  I'm being honest.  I'm trying to

16  defuse this.  I'm trying to forget about it.

17  We're reliving something that's very hard for me

18  to do because I'm trying to do -- the idea of my

19  counseling is trying to get this out of me.  It's

20  not something I want to --

21     Q.    I may ask you about your counseling

22  later, or one of the other attorneys may ask you.

23  I'm going to ask you questions that you're

24  obligated to answer.

86

1      A.    I'm obligated to answer if I can.

2      Q.    I can only ask you what you recall.  Are

3 you telling me you saw anyone froth at the mouth?

4 This is your best recollection?

5      A.    One or two them.  I don't remember their

6 names.  I don't know who they were.

7      Q.    Okay.  But you saw one or two troopers

8 frothing at the mouth?

9      A.    Yeah, like spit, like saliva.

10     Q.    The first trooper is -- he says "Get out

11 of the car," he stopped you from putting the keys

12 in the ignition, he said something about "Give me

13 the keys," you responded.  He tells you to take

14 your hand out of the bag.  And you do so.

15     A.    Yes.

16     Q.    What happens next?

17     A.    Well, then as far as I can remember, the

18 rest of them came over and they -- one of them

19 went over to the passenger door at some point.  I

20 don't know how many minutes.  I don't know the

21 details.

22     Q.    Do you know which one?  Again, I'm going

23 to ask you for your best recollection.

24     A.    I don't know which one.  I didn't know

Kevin Clapp vs
Charles Baker, et al.

Kevin Clapp
October 06, 2020

87

1  them, Brian.  I didn't even know they were state

2  police.

3       Q.    Can you describe any of them?

4       A.    No, it was dark.

5       Q.    Which one did what?

6       A.    You know, it was so foggy, they just all

7  conveyed on me, conveyed, however, you want to say

8  it.  And they were pulling at me, they were trying

9  to pull me out of the car and then they went, they

10 got a -- I saw some metal thing that looked like a

11 crowbar that they're trying to pull me, and they

12 pulled my arm and then the one on the right side

13 that opened the door and how he opened that door,

14 that door was locked.

15            Those cars, the doors lock when you shut

16 the key off.  Whoever was the first one at the

17 door unlocked the master lock, he unlocked the

18 master lock to unlock the passenger door.  So who

19 the person was at the passenger door between my

20 Explorer could open the door.  That's how he got

21 in because the door locks on those cars when you

22 shut the key off.  They automatically all lock and

23 the only one that opens is the one you manually

24 open.

1        The person that first came over took the
2 liberty to open the door for his -- for the other
3 person that was over by the passenger side.  And
4 that person then took my arm and kept pulling it
5 and pulling it, trying to pull me out the window
6 like, like a cannibal.
7        Q.   Let's -- so now you've got a guy on the
8 right side.
9        A.   Right.
10        Q.   You tell me he took your right arm and
11 tried to pull you out of the passenger door?
12        A.   Right.  He was trying to pull me out the
13 passenger door.
14        Q.   Were the windows up?
15        A.   Yes, so he had the door.  He had the
16 door --
17        Q.   The windows were up; it's March, right?
18        A.   Yes, it's dark.  Gets dark early in
19 March.
20        Q.   It's fairly cold.
21        A.   Yeah, it was pretty cold that night.
22        Q.   Windows are up.  How is he trying to
23 pull you out the window?
24        A.   I'm sorry, not the window, the door.

Kevin Clapp vs
Charles Baker, et al.

Kevin Clapp
October 06, 2020

89

1    Q.    The guy on the right is trying to pull
2 you out the passenger door and the guy on the left
3 is trying to pull you out the driver's door?
4    A.    I don't remember exactly, but he's got,
5 like, this tool that's trying to push me out the
6 passenger door.  I guess that wasn't working.
7    Q.    Who's trying to push you out the
8 passenger door; the guy on the right or the guy on
9 the left?
10    A.    The guy on the left is helping the guy
11 on the right.  The guy on the left was using some
12 tool to push me out the door on the right.  And
13 the guy on the right is trying to -- has got my
14 arm.  He's trying to pull me, but I'm holding onto
15 the steering wheel.
16    Q.    You're trying not to be pulled out of
17 the car; is that fair?
18    A.    Right.
19    Q.    You're not voluntarily getting out of
20 the car.
21    A.    No.
22    Q.    Now, the guy on the left, he was trying
23 to get you to come out the driver's door to begin
24 with; right?  Is that correct?

90

1      A.    Yes.

2      Q.    And you say that changed over when the

3  guy on the right, they shifted over and tried to

4  pull you out the passenger door?

5      A.    Right.  The first phase of this, I'll

6  call it a "phase."  Phase one, we have somebody on

7  the left door that opens the door for person

8  number two.  Person number two opens the door

9  enough that they're trying to -- they took my arm

10 and they're pulling it and they wouldn't let go of

11 it.  They had a good grip.  I'm grabbing the

12 steering wheel.  There's a lot of blurs to this.

13 Now, I don't remember how many minutes at what

14 point, there was nobody, no longer somebody on the

15 passenger side.

16     Q.    The guy left the passenger side at some

17 point?

18     A.    Yes.

19     Q.    You eventually came out the driver's

20 side; right?  Is that correct?

21     A.    I guess he did.

22     Q.    No, but when you eventually got out of

23 the car or they pulled you out of the car, that

24 was the driver's side not the passenger side; am I

Kevin Clapp vs
Charles Baker, et al.

Kevin Clapp
October 06, 2020

91

1 correct?

2     A.    When it originally started, it started
3 to be the driver's side, right.

4     Q.    At some point, sir, were you out of the
5 car?

6     A.    My foot was.   My left foot.

7     Q.    You know, at some point they got you out
8 of the car; right?

9     A.    We're revisiting the same thing.   My
10 left foot.

11     Q.    I'm not asking you how it started.   At
12 some point, they got you out of the car.   Your
13 whole body, all of you.   Was it the driver's door
14 or the passenger door?

15     A.    It was the driver's door.

16     Q.    How long, the time trooper number one
17 says "Get out of the car," how long were you in
18 the car until they finally got you completely out
19 of the car?

20     A.    First of all, there was no "trooper
21 number one," because I never knew they were
22 troopers.   Let's reflect that on the record.   I
23 don't recall.   They just -- they just ambushed me.
24 They kicked me.   They threw coffee.   They spit on

92

1  me.

2      Q.   Just answer the --

3      A.   I can't possibly detail it for you,

4  Brian.

5      Q.   Believe me.  I'm going to walk you

6  through all your recollections.

7      A.   It's too bad you weren't there.  You

8  could have videotaped it, made it easier.  You're

9  asking me questions that --

10     Q.   The question that was asked to you, sir,

11 is:  What's your best recollection of the time

12 between the moment you first heard the "Get out of

13 the car," and the time you were pulled all the way

14 out of the car?

15     A.   How many minutes?

16     Q.   Yes, your best recollection; two

17 minutes, three minutes, ten minutes, what?

18     A.   From when they first approached the car

19 until when they got me out?

20     Q.   Yes?

21     A.   How many minutes?  Twenty minutes maybe.

22     Q.   Okay.  You said you were kicked.  Did

23 somebody kick you while you were inside the car?

24     A.   No, they were pulling my arm.  I felt

Kevin Clapp vs
Charles Baker, et al.

Kevin Clapp
October 06, 2020

96

1 March of 2016?

2     A.   320, 310.

3     Q.   Okay.  You described the first person

4 pulling you through the passenger -- driver door,

5 a second person pulling you toward the passenger

6 door.  At that point, what were the other two

7 troopers doing, do you know?

8     A.   I can't recall.

9     Q.   When did you ask to see an arrest

10 warrant?

11     A.   Well, that was while I was still in the

12 car.  That's a whole separate thing.  I never saw

13 an arrest warrant.

14     Q.   When did you ask to see the arrest

15 warrant?

16     A.   I asked to see it when I was in the car.

17     Q.   Why did you ask to see an arrest

18 warrant?

19     A.   Because they told me they had an arrest

20 warrant.  I said, "Well, then let me see it."

21 This was after all the drama had happened.

22     Q.   By "the drama," you mean one person is

23 trying to pull you one way, one person trying to

24 pull you the other way?

Kevin Clapp vs
Charles Baker, et al.

Kevin Clapp
October 06, 2020

97

1     A.   Right.  So I want to see an arrest

2  warrant.

3     Q.   What happens when you say "I want to see

4  the arrest warrant"?

5     A.   They said, "Well, we don't have it."  I

6  says, "Well" --

7     Q.   Then what happens?

8     A.   Well, I asked again.  I said, "It's my

9  constitutional right to see an arrest warrant for

10 anything."  I said, "I want to see it.  I want to

11 read it."

12    Q.   What did you --

13    A.   One of them came back.  I don't know who

14 it was because, again, I didn't know who they are.

15 And they slapped it.  I'll never forget the way

16 they did it with such anger.  They slapped it

17 against my driver's window, one page.  Coming to

18 find out, when I really got the arrest warrant in

19 court, my lawyer showed it to me, it was about six

20 pages.

21         A warrant is a lot more than -- I don't

22 know of any warrant that's only one page.  I don't

23 know who they were trying to kid.  So they slapped

24 that one page against the window and what it was,

Kevin Clapp vs
Charles Baker, et al.

Kevin Clapp
October 06, 2020

98

1  I could barely see it, it was a 258E Harassment
2  Prevention Order against John Fanning.  I told
3  them, "That's bullshit.  That's not an arrest
4  warrant."  I never saw it.
5          Then it kind of made sense what Da Silva
6  said to me, "Don't blame us.  We're only the cab
7  drivers.  This case is nothing but bullshit."
8  Then he said, I had a nice house for Brockton.  He
9  didn't think it was Brockton when he drove down
10 the street.  He said that too.  He told me if I
11 ever went to Aroma's, they have good food, that he
12 gets free food, cops get free food at Aroma's in
13 Abington.  I remember the conversation with him.
14 Very talkative guy.
15      Q.   I'm going to ask my question.  You're in
16 a car.  Told you you have an arrest warrant.  You
17 ask to see it.  Which one of these two people goes
18 to get it?  The guy --
19      A.   I don't know that, Brian, I don't know.
20      Q.   Did they stop trying to pull you out
21 while they went to get the arrest warrant?
22      A.   No, I think the others took over.  There
23 was -- they didn't give me any break.  They gave
24 me a break, all right, but they didn't --

Kevin Clapp vs
Charles Baker, et al.

Kevin Clapp
October 06, 2020

99

1    Q.    They're still trying to pull you out.

2    A.    Right, right.  And I had no idea who

3  they were.

4    Q.    How long did it take?

5    A.    I don't know who got the arrest warrant.

6  Who tried to get an arrest warrant that wasn't an

7  arrest warrant.

8    Q.    How long did it take after they said

9  they'd get it before they slapped the piece of

10  paper against your window?

11    A.    They never told me they were going to

12  get it.  They came back and said, "This is the

13  arrest warrant," and they slapped it against the

14  window, but it wasn't the arrest warrant.  It was

15  a 258E Harassment Prevention Order that John

16  Fanning -- when I investigated this days after,

17  how interesting, Bruce Tobin is at one court

18  getting his phony arrest warrant while John

19  Fanning is getting his --

20    Q.    Question and answer, Mr. Clapp.  The

21  question I'm asking you, not the speech you're

22  giving me.  The question I'm asking you, somebody

23  comes to the car and puts a piece of paper up

24  against your driver's window.

Kevin Clapp vs
Charles Baker, et al.

Kevin Clapp
October 06, 2020

100

1      A.   Correct.

2      Q.   That was sufficiently close that you

3 could see the piece of paper through the window;

4 right?

5      A.   Yep, very --

6      Q.   You said you knew it wasn't an arrest

7 warrant.  Had you seen arrest warrants before?

8      A.   Yes.

9      Q.   When and where had you seen arrest

10 warrants?

11      A.   When I worked on the campus police.

12      Q.   You served arrest warrants?

13      A.   I believe I did a couple.

14      Q.   You made arrests with an arrest warrant?

15      A.   I assisted somebody else.

16      Q.   Did you ever seek an arrest warrant?

17      A.   No, somebody else did.  I assisted them,

18 but I always remember showing them to the person,

19 it was a few.  They have a right to see them.

20 That's their constitutional right.  They have the

21 right to read them just like they do with a search

22 warrant or any type of warrant.  That's your

23 right.

24      Q.   The document that was put up against the

101

1 window, you said that was a 258E Harassment Order

2 for John Fanning?

3      A.   Prevention order, correct.

4      Q.   And were you -- and you recognized it as

5 a 258E order?

6      A.   Only because it was dark and the writing

7 was big on the paper and I saw "John" and it

8 looked like "Fanning" and I saw "258E" at the top.

9 So I put it together.  That's not an arrest

10 warrant.  They must think I'm stupid, whoever

11 these people are.  They found out I wasn't stupid.

12      Q.   Had you seen 258E orders before?

13      A.   Yeah.

14      Q.   You knew what it was when you were able

15 to read it; is that correct?

16      A.   It was obvious.  It said on the title

17 what it was.

18      Q.   You could read the title, read that it

19 was a 258E order and that it was for John Fanning;

20 correct?

21      A.   Well, I couldn't see "Fanning," I mean,

22 it was dark, some of the writing was big.  I could

23 just see between all the drama and trauma going

24 on, I knew for certain that it was a 258E and I

205

1  know, God has a strange way of bringing people

2  together.

3          Q.  Yup.

4              Now, you were arrested on March 8th of

5  2016, correct?

6          A.  I don't remember what day in March.  It --

7  it was either the 6th or the 8th.

8          Q.  Okay.  And that -- that's not here nor

9  there.  But you were arrested at your house,

10  correct, and that's the subject -- one of the

11  subjects of this lawsuit?

12         A.  Right.

13         Q.  All right.  And you're aware that Trooper

14  Fanning was not part of that execution of that

15  arrest, correct?

16         A.  Well, he wasn't there.

17         Q.  Correct.  So he did not take part in the

18  arrest itself?

19         A.  No.

20         Q.  Okay.  And Trooper Fanning did not take

21  part in the transport of you from the barracks into

22  the ambulance, do you agree?

23         A.  No.

24         Q.  Okay.  So you've named a number of

1            UNITED STATES DISTRICT COURT

2              DISTRICT OF MASSACHUSETTS

3          CIVIL ACTION NO. 1:18-CV-10426-ADB

4

5    * * * * * * * * * * * * * * * * * * * * * *

6    KEVIN S. CLAPP,

7                           Plaintiff,

8    vs.

9

10   MARK COHEN, JOHN FANNING,

11   VINCENT NOE, BRUCE TOBIN,

12   BRIAN TULLY, SCOTT KEARNS,

13   BRIAN BROOKS, and JAMES FLANAGAN,

14                           Defendants.

15   * * * * * * * * * * * * * * * * * * * * * *

16                    VOLUME II

17      CONTINUED DEPOSITION OF: KEVIN S. CLAPP

18                 Conducted Remotely

19      O'Brien & Levine Court Reporting Solutions

20                68 Commercial Wharf

21               Boston, Massachusetts

22    Friday, October 16, 2020        10:22 a.m.

23

24

166

1

2                              I N D E X

3      WITNESS:                               PAGE NO.

4      Kevin S. Clapp

5      (by Mr. Moynihan)                       180

6      (by Mr. Donnellan)                      280

7

8                         _____

9                        E X H I B I T S

10     EX. NO.                                PAGE NO.

11     Exhibit 32       Judgment               372

12                         _____

13      (Exhibit 32 electronically marked and attached to

14                       transcripts.)

15

16

17

18

19

20

21

22

23

24

251

1  that you wanted to kill John Fanning and kill his

2  wife?

3       A.  Yes.  I heard them in court along with the

4  jury.

5       Q.  All right.  And you -- you claim to have

6  had some experience in criminal procedure and

7  criminal law, correct?

8       A.  Yes.

9       Q.  All right.  Well, you'd agree with me,

10 wouldn't you, that if somebody reported that another

11 person threatened to kill someone, that would be

12 taken seriously, wouldn't it?

13      A.  After an investigation, yes.

14      Q.  All right.  And it would -- if -- if it

15 were true, it would constitute probable cause to

16 arrest that person, wouldn't it?

17      A.  Only if the investigation warranted it.

18 There was no investigation.  No one ever talked to

19 me.

20      Q.  Well, do you recall two troopers coming to

21 your house the following day?

22      A.  No.  I was not home.

23      Q.  Did they come the following day?

24      A.  No.  There was -- there was more than two,

KEVIN S. CLAPP vs
MARK COHEN

Kevin S. Clapp
October 16, 2020

256

```
1        Q.  Okay.
2        A.  A false report.
3        Q.  And you'd agree with me --
4        A.  A false report.
5        Q.  That's your position.
6            And you'd agree with me that two troopers
7    went to your house the same day to speak to you,
8    isn't that correct?
9        A.  Right.
10       Q.  All right.  And that was before an arrest
11   warrant was obtained, isn't that correct?
12       A.  That's right.
13       Q.  All right.  So there was an allegation of a
14   threat, there was attempted follow-up investigation,
15   and then there was issuance of an arrest warrant,
16   correct?
17       A.  That's right.
18       Q.  All right.  And, pursuant to that arrest
19   warrant, the troopers went to your house to arrest
20   you, correct?
21       A.  They went to my house to what?
22       Q.  To arrest you.
23       A.  What, the first time or second time?
24       Q.  The second time when they came with a
```

KEVIN S. CLAPP vs
MARK COHEN

Kevin S. Clapp
October 16, 2020

257

1    warrant.

2        A.   Oh, I didn't know they were troopers.

3    That's when I was ambushed pulling into my driveway.

4    I am not going to revisit -- I'm not going to --

5        Q.   But you --

6        A.   I'm not going to revisit this whole thing

7    that I went with Mr. Rogal over already --

8        Q.   Well, you --

9        A.   -- about up the driveway, down the

10   driveway, the lights were out.

11       Q.   No.  And I'm not going to do that.  But

12   you would agree -- you know now, sir, don't you,

13   that there was an arrest warrant that day for your

14   arrest, correct?

15       A.   Right.  A phoney one, right.

16       Q.   That's your position.

17       A.   Well, actually, I proved it.

18       Q.   All right.  And Mr. Fanning pursuant to

19   this allegation, as you say, of a threat to kill

20   sought out a harassment prevention order, isn't that

21   correct?

22       A.   Yeah, and I'd like to tell you a little bit

23   about that.

24       Q.   Well, let me ask you this:  If -- if -- if

295

1   know the names of them.  I mean, I -- if I saw three

2   of them today or four of them, that lieutenant, I

3   couldn't recognize them.

4       Q.  All right.  Mr. Clapp, so I need to know,

5   the first person that approached your car, was it

6   words that were said to you or was it an act that

7   was done to you?

8       A.  I -- I can't recall exactly.  I -- I

9   remember having my foot down in the car.  I think

10  they asked, "You're Clapp," or something like that

11  and it was -- it was just an off-the-wall thing that

12  they said, and I tried to put the keys back in the

13  ignition because I was trying to back up.  I was

14  going to drive -- I was driving away.  There was

15  no -- there was no police cars.  There was nothing

16  there.  And --

17      Q.  So are you -- I appreciate your answer.  So

18  you're saying they asked you if you were Mr. Clapp,

19  is that correct?

20      A.  I -- I think they called -- they -- they

21  seemed to know my name --

22      Q.  All right.  And --

23      A.  -- if I remember.  If I remember, but

24  again, a lot of this is blank.  I -- I --

302

1    Q.  Yeah.  And you're familiar with 258E

2  orders, are you, sir?

3    A.  Yes.

4    Q.  Okay.  And how is it that you're

5  knowledgeable about those?

6    A.  How much knowledge do I have?

7    Q.  No, no.  How is it that you're familiar

8  with 258E orders?

9    A.  Oh, I've gotten them before.  It's a --

10  it's a -- it's a joke in the State of Massachusetts

11  that was put in ten years ago.  You -- you just make

12  up three documented lies, you go to a court, and you

13  convince a judge.  Some judges are real sharp and

14  they don't issue them because they are not

15  documented and -- and they say they are in fear but

16  people don't -- some judges don't know what the real

17  definition of fear is.

18        If you say you're going to get someone

19  disbarred and you're going to fire them, that's not

20  a reason, as Judge Solviano said many times, to

21  issue a 258E.  Now, if you say I'm going to light

22  your boat on fire and I'm going to flatten all your

23  tires, that would put a reasonable person in fear.

24  So fear is a real broad word that is --

303

1      Q.  Mr. Clapp.

2      A.  -- accepted by many judges.

3      Q.  Mr. Clapp.

4      A.  Yes.

5      Q.  Mr. Clapp, thank you.  Thank you for that

6   answer.

7           So is it your testimony, sir, that you've

8   been the subject of 258E orders prior to the one --

9      A.  Yes.  Yes.

10     Q.  When was that?

11     A.  Well, Quincy College.  John Fanning, one

12  from Quincy College.  I don't -- I don't remember

13  the others.  I don't -- I don't remember the others,

14  but they are civil in nature unless they are

15  violated.  Are you aware of that?

16     Q.  All right.  So you've -- you've been the

17  subject of at least two 258E orders, is that

18  correct?

19     A.  Yeah.  Maybe, more.  I -- I -- I don't

20  remember.  I mean, I -- I don't use the -- I don't

21  use the courts, Joe, to -- to get back at people.

22  I'm not -- I wasn't raised like that.

23     Q.  All right.  Well, we'll get into that in a

24  little bit.