```
                                        Volume: 1
                                        Pages: 1-289

                                        Exhibits: See Index

              COMMONWEALTH OF MASSACHUSETTS

PLYMOUTH, SS.                           SUPERIOR COURT DEPARTMENT
                                        OF THE TRIAL COURT


*******************************
                              *
COMMONWEALTH OF MASSACHUSETTS *
                              *
vs.                           *         Docket No. 1615CR001347
                              *
KEVIN S. CLAPP                *
                              *
*******************************

                    TRIAL DAY ONE
          BEFORE THE HONORABLE SCOTT D. PETERSON


APPEARANCES:

For the Commonwealth:
Plymouth County District Attorney's Office
By: Nicole Pitts, Esquire
66 Main Street
Brockton, MA, 02301-4339

For the Defendant:
Massachusetts Bar
By: Jennifer Wynne Lokitis, Esquire
P.O. Box 365
Chartley, Massachusetts 02712
508.226.6923

                                        Brockton, Massachusetts
                                        Courtroom 10
                                        November 14, 2019


Court Transcriber:  Lisa Marie Phipps, Certified Shorthand
Reporter, Registered Professional Reporter, Certified
Realtime Reporter
```

*LMP*

*Serving: Massachusetts  Rhode Island*
*Connecticut  New Hampshire*
LMPREPORTING@GMAIL.COM
(508) 641-5801

# I N D E X

PAGE:

IMPANELMENT:                                          11

OPENING STATEMENT:

For the Commonwealth                                  62
for the Defendant                                     64


| WITNESS: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Brian Tully | | | | |
| (By Ms. Pitts) | 67 | | | |
| (By Ms. Lokitis) | | 83 | | |
| Bruce Tobin | | | | |
| (By Ms. Pitts) | 99 | | | |
| (By Ms. Lokitis) | | 109 | | |
| Scott Kearns | | | | |
| (By Ms. Pitts) | 118 | | | |
| (By Ms. Lokitis) | | 127 | | |
| Brian Brooks | | | | |
| (By Ms. Pitts) | 137 | | | |
| Andrew Da Silva | | | | |
| (By Ms. Pitts) | 145 | | | |
| (By Ms. Lokitis) | | 148 | | |
| Kevin Clapp | | | | |
| (By Ms. Lokitis) | 156 | | | |
| (By Ms. Pitts) | | 177 | | |

EXHIBITS:                                            PAGE:

12           Use of Force Policy                       82

13           Leather Jacket                           167

1  in contact with Mr. Clapp?
2  A.  At about 5:30 p.m.
3  Q.  Okay.  And at that time, what happened?
4  A.  Sergeant Tobin and I were sitting in my
5  cruiser outside of his address in Brockton.
6      Trooper Kearns was at a different
7  location, and he advised us over the radio that
8  Mr. Clapp's car was pulling into the driveway of
9  his residence.
10 Q.  So at that time, how many troopers were
11 there?
12 A.  There were four of us, Sergeant Tobin and I
13 in one car and Lieutenant Brooks and
14 Trooper Kearns in another car.
15 Q.  Okay.  So when Mr. Clapp pulled into his
16 driveway, did you all approach him at one time?
17 A.  I was closest where our car was, and I got
18 out and I approached the vehicle first and
19 Sergeant Tobin was right behind me.
20 Q.  And the other two troopers were still in
21 their vehicles?
22 A.  They were, and they went on foot to the
23 vehicle shortly thereafter.
24 Q.  Okay.  So when you approached the car, was
25 the door open?

1   A.   Yes.
2   Q.   Okay.  So the door was already open?  You
3   didn't ask him to open the door?
4   A.   Right.
5   Q.   He was sitting -- where was he sitting?
6   A.   The vehicle was parked in the driveway and I
7   noticed a male that looked like Kevin Clapp --
8   this is the first time that I had seen him --
9   seated in the front driver's seat and he was the
10  only person in the vehicle.
11  Q.   Okay.  So when you approached the vehicle,
12  what happened?
13  A.   I identified myself as Trooper Tully with the
14  Massachusetts State Police.  I was wearing a
15  shirt and tie like I am today with no jacket.  I
16  had my bulletproof vest over the top, and the
17  badge that I have on my hip right now has a chain
18  on it, and I had that around my neck and clipped
19  to my vest so it wouldn't spin around or get in
20  my way.
21  Q.   Okay.  So you identified yourself --
22  A.   Yes.
23  Q.   -- as a Massachusetts state trooper?
24  A.   Yes.
25  Q.   And what happened at that time?

```
 1   A.   I asked the driver if he is Kevin Clapp, to
 2   which he replied yes, and I stated that I had an
 3   arrest warrant for him and that he was under
 4   arrest.
 5   Q.   Okay.  And what did you -- what happened at
 6   that time?
 7   A.   He was seated.  I placed my right hand on
 8   his -- the collar of his jacket.  He was wearing
 9   a big leather jacket -- not big, but a leather
10   jacket, and his left hand was on the steering
11   wheel, so I placed my left hand on his wrist just
12   to put my hands on him.
13        It's a very dangerous time, once you tell
14   someone they're under arrest, between that time
15   when I have them in handcuffs, because I don't
16   know what this person's reaction is going to be
17   to the fact that they're going to be under
18   arrest.
19        So I placed my hands on him and asked him
20   to step out of the vehicle.
21   Q.   Did he step out of the vehicle?
22   A.   No.
23   Q.   What did he do?
24   A.   He pushed back with his left hand against the
25   steering wheel, so he was kind of sitting back in
```

1    the vehicle.
2              I asked him two more times to step out of
3    the vehicle, to which he replied that he was not
4    going to get out of the fucking car.  Excuse my
5    language.
6    Q.   So he said he wasn't going to get out of the
7    car?
8    A.   Yes.
9    Q.   And you had to ask him two more times to get
10   out of the car?
11   A.   Yes.
12   Q.   Did he get out of the car at that time?
13   A.   No.
14   Q.   So what happened at that point?
15   A.   Mr. Clapp stated he wanted to see the
16   warrant, so Sergeant Tobin went back to his car
17   and retrieved the paper warrant that he had
18   received from Stow District Court and brought it
19   back to Mr. Clapp's vehicle.
20   Q.   Is that something you would normally do --
21   A.   This is the only time we've ever done that.
22   Q.   -- that you would comply with someone who you
23   were there to place under arrest, go and retrieve
24   a warrant to show them?
25   A.   No.  Like I said, once I tell someone they're

1  under arrest, my priority is to secure them for
2  everybody's safety.
3  Q.  So fair to say you did more than you had to?
4  A.  Yes.
5  Q.  So Trooper Tobin goes to get the warrant, he
6  brings it back.
7      And what happens at that time?
8  A.  Sergeant Tobin went in from the passenger
9  side and showed him the -- showed Clapp the
10 warrant in the vehicle.
11     Clapp's response to seeing it was, This is
12 bullshit and continued to push against the
13 steering wheel so I wouldn't be able to pull him
14 out of the vehicle.
15 Q.  Okay.  Did you ask him again to step out of
16 the vehicle?
17 A.  I did.  And at this point we've showed him
18 the warrant, we've complied with him.
19     And I instructed him that I'll have to use
20 some force to effect the arrest if he doesn't
21 step out of the vehicle.
22 Q.  And before you get to that point, how long
23 would you say this interaction was?
24 A.  Over a minute.
25 Q.  Okay.  And so at that point, you informed

1   Mr. Clapp that you're going to have to use force.
2           And what happens at that time?
3   A.  His right arm was still kind of not touching
4   anything.  He had been reaching for his bag, and
5   I told him to stop doing that.
6           But once I told him I would have to start
7   to use force, he grabbed the steering wheel with
8   both hands.
9           And I attempted to, with his left wrist
10  and his collar of his jacket, to pull him out in
11  a technique we call an arm bar, which is where I
12  can try to control his arm to control the rest of
13  his body.
14  Q.  Were you able to -- I'm sorry, continue.
15  A.  While I was doing that, Sergeant Tobin was
16  actively pushing from the passenger side.
17  Q.  So you're at the driver's side trying to pull
18  him out by his collar and his arm; and Trooper
19  Tobin, you said, goes to the other side, the
20  passenger side.
21          And what is he doing at that time?
22  A.  He's pushing on Clapp's right shoulder and
23  maybe, you know, his torso and pushing in my
24  direction, so that he's pushing and I'm pulling
25  in an attempt to get him out of the vehicle.

1  badges, anything with a (indiscernible) color of
2  authority, absolutely not.
3           THE COURT:  Sir, I told you you just have
4  to answer the questions, okay?  No
5  editorializing.  Next question.
6  BY MS. LOKITIS:
7  Q.  So when you heard that the trooper was there
8  with an arrest warrant, what was your -- what did
9  you do?
10 A.  Well, it's your constitutional right to see
11 it, just like a search warrant.
12 Q.  No.  My question was what did you do?
13 A.  I said, I want to see it.
14 Q.  Okay.  And when you asked to see the warrant,
15 what happened?
16 A.  Trooper Tobin, I believe -- and I didn't know
17 any of them at the time; I just learned their
18 names from -- through the years here -- they
19 placed it against my glass window.
20          My window wasn't down.  They didn't hand
21 it to me, and I remember them placing it against
22 the window.
23 Q.  When you say they placed it against the
24 window, the window -- which window in the car?
25 A.  My driver's window.

1  vehicle.  The troopers told you they had a
2  warrant.  They told you to get out of the car
3  multiple times.  You refused to get out of the
4  car.
5         The trooper testified to -- that he asked
6  you again that if you were not going to step out
7  of the car, that he would use force.
8         Did he tell you that?
9  A.   The force on that jacket to rip, what they
10 did, it would almost have to be an animal to do
11 that.
12 Q.   Okay.  So my question is -- well, we saw the
13 rip.
14        It's a tear and not a rip?
15 A.   Did you see how big the thread is on it?
16 Q.   It's a tear and --
17 A.   It's a tear?
18 Q.   -- and it's separated.  I mean, the jury will
19 be able to see it.
20 A.   I hope so.
21 Q.   So they have you -- they're trying to remove
22 you from the car?
23 A.   Yeah.
24 Q.   And you're not getting out?
25 A.   No.